NOT DESIGNATED FOR PUBLICATION

No. 122,476

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ELI MENDOZA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed November 5, 2021. Affirmed.

*Hope E. Faflick Reynolds*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., POWELL and CLINE, JJ.

PER CURIAM: Eli Mendoza appeals following his convictions of attempted first-degree murder, aggravated robbery, criminal possession of a weapon by a convicted felon, aggravated domestic battery, and criminal threat. Mendoza claims: (1) The district court erred when it refused to instruct the jury on the lesser included offense of attempted voluntary manslaughter; (2) the district court erred when it calculated his criminal history score; and (3) the use of judicial findings of prior convictions to increase his sentence violated section 5 of the Kansas Constitution Bill of Rights. Finding no reversible error, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

This case arises from two incidents involving Mendoza and his former girlfriend, S.G. Mendoza and S.G. dated for a couple of months and S.G. sometimes spent the night at Mendoza's home. In the early morning hours of August 4, 2018, S.G. received a phone call from a friend asking if she was all right because of her recent homelessness. S.G. told the friend she was with Mendoza. Mendoza suspected S.G. was cheating on him and confronted her about those suspicions. S.G. later testified that Mendoza put his hands around her neck so that she could not breathe. She also told dispatch that Mendoza hit her several times with a closed fist and refused to let her leave the room. S.G. eventually freed herself and Mendoza chased her as she ran from the house to her car. While S.G. started her SUV, Mendoza slashed one of the tires. S.G. drove on the flat tire to a gas station to call her friend and 911. Because it was a busy night for local police, S.G. had to call 911 a second time to request emergency medical services for her pain.

EMS took S.G. to the hospital where a nurse photographed her injuries. Her injuries included: (1) bruising in and around her eyes, behind an ear, and to her face; and (2) petechial hemorrhages behind an ear and in multiple locations inside her mouth. Sexual Assault Nurse Examiner Cara Brunswig considered S.G.'s injuries consistent with her report of having been strangled and sustaining blunt force trauma to her face.

After this incident, Mendoza threatened to self-harm and sent S.G. a picture of himself with a gun to his head. Sometime between August 4 and August 9, Mendoza and S.G. met at a park to exchange a work shirt of S.G.'s, but she left when she thought Mendoza was acting "suspicious."

On August 9, 2018, Mendoza asked S.G. for a ride to work. S.G. testified she had given Mendoza many rides to work. On the way to work, Mendoza and S.G. disagreed on the best route to take to get to Mendoza's job. A brief time later, Mendoza took S.G.'s cell

2

phone off the car charger and put it in his bag. S.G. told Mendoza to return her cell phone and stopped the SUV in the middle of the street waiting for Mendoza to return the phone. S.G. testified that at that point, Mendoza told her he would shoot her, that he had bullets, and to "fucking drive." She also testified Mendoza said, "'Drive or I'm going to shoot you.'" When S.G. asked him why he would want to shoot her, Mendoza pulled a revolver from his bag. He pointed the gun at her face and said he would kill her.

S.G. tried to knock the gun away when Mendoza fired the gun, hitting S.G. in the chest. S.G. tried to leave the car but struggled with the seatbelt. After she reached into the backseat for her purse and pulled it forward up to her face, Mendoza fired the gun again, this time hitting S.G. in the right arm. She escaped the car by sliding to the ground then ran down the street toward an approaching pickup truck. When she glanced back to the SUV, she saw Mendoza get into the driver's seat and drive away. The driver of the pickup truck helped S.G. and called 911. Mendoza later abandoned the SUV in an alley. Police arrested Mendoza several days later in New Mexico.

The State charged Mendoza with one count each of attempted first-degree murder, aggravated robbery, criminal possession of a weapon by a convicted felon, aggravated domestic battery, criminal damage to property, and criminal threat. Mendoza pled not guilty and requested a jury trial.

S.G. testified at the trial. The State also called several witnesses who lived or worked near the shooting incident on August 9, 2018, and these witnesses described what they saw and heard. The State also called as witnesses several law enforcement officers who investigated the crimes. Dr. Jordan Groskurth testified the bullet that entered S.G.'s right arm fragmented and left her with nerve damage. He testified S.G.'s other gunshot wound appeared to resemble a through and through wound because the breast exhibited two wounds and an x-ray of S.G.'s chest revealed her chest was free of bullet fragments. Brunswig also testified for the State about S.G.'s injuries on August 4.

3

Mendoza did not testify at trial. Through his counsel's closing argument, Mendoza admitted he argued with S.G. on August 4 but argued that her injuries were not consistent with someone who had been beaten and choked. As for the August 9 incident, Mendoza admitted pulling a gun on S.G. but argued the evidence showed the gun fired accidently both when S.G. tried to knock it away and when S.G. pulled her purse from the backseat. Mendoza's defense was that the State failed to prove premeditation and an intent to kill.

The district court instructed the jury on the lesser included offense of attempted second-degree murder. Mendoza requested an instruction on the lesser included offense of attempted voluntary manslaughter. The district court denied Mendoza's request, finding the instruction not factually appropriate. The jury acquitted Mendoza of criminal damage to property but convicted him of attempted first-degree murder and the remaining charges. The jury found the crimes of attempted first-degree murder, aggravated robbery, and criminal threat were acts of domestic violence.

Before sentencing, Mendoza objected to his criminal history in his presentence investigation (PSI) report. Mendoza objected to two New Mexico convictions of aggravated assault against a household member from being scored as person felonies. He also objected to his Kansas criminal threat conviction, which the State conceded was for reckless criminal threat, from being included in his criminal history based on *State v. Boettger*, 310 Kan. 800, 823, 450 P.3d 805 (2019), *cert. denied* 140 S. Ct. 1959 (2020).

At sentencing, the district court overruled Mendoza's objections to his criminal history and sentenced him based on his criminal history score of A. The district court overruled the objection to scoring the reckless criminal threat conviction because the Kansas Supreme Court had not issued the mandate for the *Boettger* decision. The district sentenced Mendoza to a controlling term of 666 months' imprisonment with 36 months' postrelease supervision. Mendoza timely appealed the district court's judgment.

4

DID THE DISTRICT COURT ERR IN DENYING MENDOZA'S REQUEST TO INSTRUCT THE JURY ON ATTEMPTED VOLUNTARY MANSLAUGHTER?

Mendoza first claims the district court erred when it refused to instruct the jury on the lesser included offense of attempted voluntary manslaughter. More specifically, Mendoza argues the evidence shows that the shooting incident occurred upon a sudden quarrel or in the heat of passion. The State responds that an instruction on attempted voluntary manslaughter was not factually appropriate. Alternatively, the State argues that any error in not instructing on attempted voluntary manslaughter was harmless.

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

At the second step, appellate courts consider whether the instruction was legally and factually appropriate. 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016). When evaluating whether a lesser included instruction is factually appropriate in the individual case, courts use the following test: "Is there some evidence when viewed in the light most favorable to the defendant that would allow a rational factfinder to find the defendant guilty of the lesser included offense?" *McLinn*, 307 Kan. at 324-25; see K.S.A. 2018 Supp. 22-3414(3).

The district court must instruct the jury on lesser included offenses even if the evidence is weak or inconclusive. *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014). If the defendant requested the instruction, the district court's failure to give it is grounds for reversal unless the State shows that there is no reasonable probability the

absence of error would have changed the jury's verdict. *State v. Gentry*, 310 Kan. 715, 720-21, 449 P.3d 429 (2019).

Generally, an appellant must preserve an issue for appeal in the district court by requesting an instruction or objecting to the district court's denial of his or her request. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Mendoza preserved the jury instruction claim by both requesting the attempted voluntary manslaughter instruction and objecting on the record to the district court's denial of his request.

Voluntary manslaughter is "knowingly killing a human being committed: (1) Upon a sudden quarrel or in the heat of passion; or (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force." K.S.A. 2018 Supp. 21-5404(a). The core elements of voluntary manslaughter are an intentional killing and legally sufficient provocation. *State v. Campbell*, 308 Kan. 763, 775, 423 P.3d 539 (2018). Our Supreme Court has determined voluntary manslaughter to be a lesser included offense of premeditated first-degree murder. 308 Kan. at 775. Thus, an attempted voluntary manslaughter jury instruction would have been legally appropriate.

Mendoza's entire argument in his brief that an instruction on attempted voluntary manslaughter would have been factually appropriate is as follows:

> "The evidence showed [S.G.] and Mr. Mendoza argued before the shooting. They had another loud, physical altercation days before the shooting when Mr. Mendoza suspected [S.G.] of cheating. A reasonable jury could infer that this fight in the car took the same tenor as the earlier altercation, and that Mr. Mendoza acted impulsively, without reflection and in the heat of passion."

To determine whether the instruction was factually appropriate, this court must consider what constitutes "sudden quarrel" or "'heat of passion.'" See *State v. Hayes*, 299 Kan. 861, 865-66, 322 P.3d 414 (2014). To claim someone killed in the "'heat of

passion,'" there must be adequate provocation under the law. 299 Kan. at 864. When reviewing whether provocation was legally sufficient, an objective standard is used. 299 Kan. at 864. "Heat of passion" is "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" 299 Kan. at 864.

Caselaw is clear that the provocation must be severe—it must be calculated to deprive a reasonable person of self-control and to cause that person to act out of passion rather than reason. And it must consist of more than mere words or gestures to be legally sufficient. *State v. Robertson*, 279 Kan. 291, 306, 109 P.3d 1174 (2005). Similarly, mere evidence of an altercation does not alone support a finding of sufficient provocation. *State v. Mitchell*, 269 Kan. 349, 353, 7 P.3d 1135 (2000).

A person does not kill in the "heat of passion" if sufficient time has elapsed between the alleged provocation and the killing or attempted killing for an ordinary person to regain reason. See *State v. Follin*, 263 Kan. 28, 38, 947 P.2d 8 (1997). The defendant's emotional state of mind must have existed at the time of the act. *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). And when it is not unusual for the victim and the defendant to argue, the Kansas Supreme Court considers the recurring nature of an argument as tending to "negate the 'sudden' aspect of sudden quarrel; the argument did not happen 'without warning' and was foreseeable." *State v. Bernhardt*, 304 Kan. 460, 477, 372 P.3d 1161 (2016).

In *State v. Northcutt*, 290 Kan. 224, 224 P.3d 564 (2010), our Supreme Court addressed whether the evidence presented during a first-degree murder trial supported the defendant's request for a jury instruction on sudden quarrel voluntary manslaughter. In that case, the defendant and his brother were suspected of killing David Mason. At trial, the defendant testified that Mason owed him money and that Mason had borrowed some camera equipment from him which he never returned. Mason lived in an apartment with

the defendant's brother. The defendant told his brother that he wanted to confront Mason and asked his brother to call him when Mason arrived at the apartment. The defendant's brother called a short time later, and the defendant rode his bicycle to the apartment.

When the defendant arrived at the apartment, he brought with him a climber's "impelling rope" that he routinely used to secure his bicycle. The defendant testified that he came up behind Mason as he sat at his computer and "'kind of kicked him in the butt'" and asked if he had his camera. 290 Kan. at 229. Mason jumped up, bringing some computer cords with him. According to the defendant, the two men got "'tangled up'" in the computer cords and the impelling rope. 290 Kan. at 229. The arguing continued and the defendant eventually followed Mason into his bedroom. According to the defendant, Mason fell backwards as the two men struggled, hitting his head on the bed railing. The defendant testified that he and his brother left the apartment. When they returned the next day, they found Mason dead. The jury convicted the defendant of premeditated first-degree murder and conspiracy to commit first-degree murder.

On appeal, the defendant argued that the district court erred in refusing to instruct the jury on voluntary manslaughter as a lesser included offense of premeditated first-degree murder. The defendant argued that the jury could have believed that Mason provoked a sudden quarrel when he stood up from the computer and entangled the defendant in the computer cords, causing a fight to ensue.

Our Supreme Court acknowledged that the defendant was entitled to a voluntary manslaughter instruction provided there was some evidence which would reasonably justify a conviction of the lesser included crime. 290 Kan. at 233. But the court found that the defendant's argument "ignores Kansas precedent that requires *severe* provocation to justify giving a voluntary manslaughter instruction." (Emphasis added.) 290 Kan. at 233; see, e.g., *State v. Vasquez*, 287 Kan. 40, 55-56, 194 P.3d 563 (2008); *State v. Gallegos*,

8

286 Kan. 869, 874, 190 P.3d 226 (2008); *State v. Drennan*, 278 Kan. 704, 713, 101 P.3d 1218 (2004); *State v. Horn*, 278 Kan. 24, 40-41, 91 P.3d 517 (2004).

The *Northcutt* court also stated that "[u]nder our precedent, mere evidence of an altercation between parties does not alone support finding sufficient provocation" to justify instructing the jury on voluntary manslaughter as a lesser included offense. 290 Kan. at 234; see, e.g., *Gallegos*, 286 Kan. at 874-75; *Mitchell*, 269 Kan. at 353. The *Northcutt* court noted that the test of the sufficiency of the provocation is objective, not subjective. 290 Kan. at 234. The court also stated that the provocation, whether it be a sudden quarrel or some other form of provocation, must be enough to cause an ordinary person to lose control of his or her actions and reason. 290 Kan. at 234.

Returning to our facts, we first observe that any argument between Mendoza and S.G. on August 4, 2018, was too remote in time to be considered part of the provocation for the August 9 shooting. As for the incident in the SUV on August 9, there was evidence at trial that Mendoza and S.G. disagreed about whether S.G. was taking the best route to get to Mendoza's job. A brief time later, Mendoza took S.G.'s cell phone off the car charger and put it in his bag. S.G. told Mendoza to return her phone and stopped the SUV in the middle of the street waiting for Mendoza to return the phone.

Caselaw is clear that provocation must be severe to justify giving a voluntary manslaughter instruction. *Robertson*, 279 Kan. at 306. We acknowledge that we must view the evidence in the light most favorable to Mendoza in deciding whether the requested instruction on attempted voluntary manslaughter would have been factually appropriate. But we simply do not have enough evidence here of a severe provocation to support an instruction on attempted voluntary manslaughter based on sudden quarrel or heat of passion. We conclude the district court did not err in failing to give the requested instruction, and we need not reach the State's argument that any error was harmless.

9

DID THE DISTRICT COURT ERR IN CALCULATING MENDOZA'S CRIMINAL HISTORY SCORE?

Mendoza next claims the district court erred when it calculated his criminal history score. More specifically, Mendoza argues that the district court erred when it included his now unconstitutional reckless criminal threat conviction in determining his criminal history score. The State asserts that Mendoza's objection to scoring his reckless criminal threat conviction, while correct, is moot because his criminal history score of A will not change even when the criminal threat conviction is not scored.

In district court, Mendoza also objected to the PSI report scoring his two New Mexico convictions as person felonies. But Mendoza does not renew this challenge on appeal, so the issue is considered waived and abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

The classification of prior offenses for criminal history purposes involves interpretation of the revised Kansas Sentencing Guidelines Act (KSGA), K.S.A. 2018 Supp. 21-6801 et seq. Statutory interpretation is a question of law subject to unlimited review. *State v. Wetrich*, 307 Kan. 552, 555, 412 P.3d 984 (2018).

As Mendoza correctly argues, under K.S.A. 2018 Supp. 21-6810(d)(9), the district court cannot use a prior conviction later found unconstitutional by an appellate court to calculate a defendant's criminal history. In *Boettger*, our Supreme Court declared Kansas' reckless criminal threat statute to be unconstitutionally overbroad. 310 Kan. at 823. At Mendoza's sentencing, the district court scored the conviction anyway because the mandate in *Boettger* had not been issued. But the mandate was later issued after the United States Supreme Court denied certiorari. Thus, the district court erred in scoring Mendoza's reckless criminal threat conviction, and the State concedes this point.

But as the State points out, Mendoza's criminal history score of A will not change even when the criminal threat conviction is not scored. Mendoza's PSI report shows that he has two New Mexico convictions of aggravated assault against a household member, each scored as a person felony, and a Kansas conviction of fleeing or attempting to elude an officer, scored as a person felony. With three prior person felony convictions, Mendoza's criminal history score remains in category A. See K.S.A. 2018 Supp. 21-6809. Thus, Mendoza's sentence is not illegal, and he is entitled to no relief on this claim.

DOES MENDOZA'S SENTENCE VIOLATE SECTION 5 OF THE KANSAS CONSTITUTION BILL OF RIGHTS?

Finally, Mendoza claims that the use of judicial findings of prior convictions to increase his sentence violates section 5 of the Kansas Constitution Bill of Rights. More specifically, Mendoza maintains that the KSGA violates section 5 of the Kansas Constitution Bill of Rights by denying his right to have a jury determine his criminal history for sentencing. The State responds that the district court did not err in considering Mendoza's prior convictions when determining his sentence. A constitutional challenge to the KSGA involves a question of law subject to unlimited review. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

After the parties filed their briefs, the Kansas Supreme Court decided this issue adversely to Mendoza's claim in *State v. Albano*, 313 Kan. 638, Syl. ¶ 4, 487 P.3d 750 (2021). The Kansas Court of Appeals is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that our Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no indication that our Supreme Court is departing from its recent unanimous decision in *Albano*.

Affirmed.